14 So.2d 462

**HOLLOWAY v. GEO. L. SQUIER MFG. CO. et al.**

No. 36840.

May 17, 1943.

Rehearing Denied June 21, 1943.

Sanders, Miller & Herget, of Baton Rouge, for appellant.

Wm. H. McClendon, Jr., of New Orleans, for appellee.

FOURNET, Justice.

Glenn H. Holloway, doing business as the Southern Engineering & Sales Company, instituted attachment proceedings against the George L. Squier Mfg. Company of Buffalo, New York, a corporation engaged in the manufacture of machinery used in the processing of sugar, rice, and coffee, to recover the balance of $22,500 allegedly due him under a verbal commission contract for the sale of machinery and equipment to the Iberia Sugar Cooperative, Inc., of New Iberia, Louisiana, making the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College, a debtor of the defendant, a party garnishee. He is prosecuting this appeal from the judgment of the lower court dismissing his suit.

In his petition the plaintiff alleges that under his verbal contract with the defendant, entered into some time around July of 1935, he was entitled, as the company's Louisiana representative, to a commission of 5% "on the net price of the machinery sold by or through him F. O. B. Buffalo, New York," after deduction of the cost of various construction work and other specific items, to the Iberia Sugar Cooperative, Inc., under contract of April, 1937, for the construction of a sugar factory at New Iberia, Louisiana, as evidenced by defendant's letter of January 27, 1937, and that since these deductible items—the exact amount never having been divulged to him by defendant despite repeated efforts on his part to ascertain the same—could not have amounted to more than 20% of the total cost of the factory, estimated by

him to be approximately $1,000,000, he is entitled to a commission of $40,000 (5% of $800,000), less the amount of $17,500 already paid him on account, or $22,500.

The pleadings that follow are both numerous and voluminous, extending, as they did, over a period of some two years. Chronologically and briefly, they are: A rule whereby the defendant, without submitting to the jurisdiction of the court, sought to dissolve the writ of attachment on the ground that the $17,500 was paid the plaintiff by the Buffalo Forge Company, a New York corporation qualified to do business in Louisiana and the company selling the machinery, equipment, and appurtenances in question, the George L. Squier Mfg. Company neither owing the plaintiff anything nor having any contract with him. The trial judge first dismissed the rule to dissolve and recognized it as defendant's answer because of the denial therein of certain factual allegations contained in plaintiff's petition and the averrance of factual allegations contrary thereto—the contention advanced by the plaintiff in his answer to this rule—but later, in refusing defendant's application for a rehearing, he reversed his position with reference to the "answer" quality of the rule and dismissed and recalled it. Meanwhile, the garnishee having admitted owing the defendant an amount sufficient to cover the claim sued for, the plaintiff agreed to release the attachment and garnishment in lieu of a $20,000 surety bond, with the understanding that in furnishing such bond the defendant submitted to the jurisdiction of the court. The defendant's

next step was to file an exception of vagueness, seeking to have the plaintiff detail more particularly the essential stipulations of the alleged verbal contract, itemize the machinery allegedly sold, and indicate the manner and method of computing the commissions claimed to be due. After this exception was overruled by the trial judge, the defendant answered, denying the existence of any contract with the plaintiff, either verbal or otherwise, in the alternative asserting that if such contract did exist the defendant had not thereby bound itself to pay any commissions on machinery sold by the Buffalo Forge Company, the company furnishing the machinery in question. Pointing out in detail the allegations in defendant's answer that either contradicted or were otherwise inconsistent with those made in its rule to dissolve the writ of attachment, the plaintiff, reiterating his contention that this rule constituted an answer, filed a motion to strike therefrom all those portions at variance with the allegations contained in the rule. To this motion the defendant filed another exception of vagueness, which was overruled, the judge sustaining plaintiff's motion and ordering stricken from defendant's answer those portions pointed out by plaintiff to be at variance with the allegations in the rule to dissolve the writ of attachment. Prior to the rendition of this judgment, the defendant, in a supplemental and amended answer, alleged it had decided to defend the suit on the merits, reserving unto itself the benefit of the $17,500 paid the plaintiff by the Buffalo Forge Company. The trial judge then sustained plaintiff's motion to strike from this supplemental and amended answer those allegations at variance with the special defense of "no contract," "no payment," and "no debt," set out in the rule to dissolve. By a supplemental petition the plaintiff pointed out that, for all intents and purposes, the Forge and the Squier companies were one and the same, and the stipulation of counsel for plaintiff and defendant to that effect is in the record. The case was then tried on its merits and plaintiff's suit dismissed.

Plaintiff argued strenuously in this court, both orally and in brief, that the defendant was bound by the factual allegations in its rule to dissolve the writ of attachment, which he claims was in fact an answer, and that any subsequent pleadings wherein the basis of the defense was sought to be shifted by setting out contradictory or inconsistent allegations, were improperly allowed by the trial judge.

We fail to see what comfort this contention can give the plaintiff, for his suit is based on a verbal contract involving an amount in excess of $500, and it is incumbent upon him to establish his claim by one creditable witness and other corroborating circumstances. Article 2277 of the Revised Civil Code; Davilla v. Boswell, 197 La. 488, 1 So.2d 703.

Furthermore, an analysis of all of the pleadings discloses that the primary issue before the court is simply whether the plaintiff is entitled to a commission on the sale price of the sugar factory f. o. b., Buffalo, New York, less the specific items enumerated in defendant's letter of January 27, 1937, annexed to the petition, and

the $17,500 already paid him on account, as claimed by the plaintiff, or whether he is entitled to a commission of $17,643.75 (5% of $352,875, the sale price of that part of the machinery in the sugar factory manufactured by the Squier company), less the $17,500 paid him on account, proper adjustment being made for the advance of $400 made him and not considered in former calculations, as contended by the defendant.

This issue cannot be satisfactorily determined without a proper consideration of the defendant's letter of January 27, 1937, and its construction in the light of the correspondence between the parties, their conduct with respect thereto, and the circumstances surrounding the entire transaction, in the event the letter is found to be couched in ambiguous language, in order that the intention of the parties may be ascertained. The pertinent part of this letter is as follows:

"On all of the quotations we are making for you on complete sugar factories for the state of Louisiana, Mr. Schwarz has asked me to bring out that your commission will be 5% on the price Net f. o. b. Buffalo of machinery. In other words, you will not be paid commission on erection, freight, erection materials such as brick work, cement, tools, etc., on erectors' services or on the building. We are also not including the 5% on items which go to make up the complete proposition on which you will be given protection by the manufacturers because you represent them in your territory, such as the Dorr Clarifier, Richardson Scales, etc."

Thus it may be seen that "on complete sugar factories for the state of Louisiana," sold or constructed by the defendant company, the plaintiff was to receive a commission of 5% on the net price of the machinery, f. o. b. Buffalo, New York. By this, it is explained in the letter, it is meant that the only items to which plaintiff's commission of 5% was not to extend were (1) erection, (2) freight, (3) erection materials, (4) services of the erector, (5) the building, and (6) those items in the factory purchased by the defendant from those manufacturers Holloway already represented in Louisiana.

But counsel for the defendant argued, both orally and in brief, and particularly stress in a supplemental brief, that inasmuch as the contract grew out of verbal conversations and correspondence between the plaintiff and Schwarz of the defendant company, which never culminated in any definite agreement as to the commission plaintiff was to receive, the same being left to the discretion of Schwarz, the construction placed on the understanding between the plaintiff and defendant with reference to these commissions by another employee (E. D. Murphy) who was unacquainted with the matter in the letter of January 27, 1937, was not binding and did not evidence the understanding between the parties since it was only a purported conveyance of a message from Schwarz. They also argued that Holloway, meeting Schwarz in the Roosevelt Hotel in New Orleans, Louisiana, on March 1, 1937, and making no comment or objection when he was reminded during the course of a dis-

cussion of the verbal contract that his commission was on the Squier machinery only, as testified to by Schwarz, was bound by the verbal explanation of the commission due him thus made by Schwarz, especially since he failed to testify in rebuttal and deny the testimony of Schwarz in this respect. He also claims the Schwarz version of the matter is overwhelmingly borne out by the correspondence and Holloway's own testimony.

Our appreciation of the evidence in the record, particularly the correspondence (composed of some 200 letters), is that it is overwhelmingly in favor of the plaintiff's version and that it substantially corroborates the clear and explicit terms found in defendant's letter of January 27, 1937, that is, that the plaintiff was to receive a commission of 5% on all of the machinery that goes to make a complete sugar factory, other than that machinery purchased from those companies already represented by the plaintiff in Louisiana, less the other five specific items listed in the letter—(1) erection, (2) freight, (3) erection materials, (4) erectors' services, and (5) building.

According to the record, Holloway was endeavoring to "swing" the sugar factory job in New Iberia for about two years before the contract for its erection was finally signed. It was to be a "lock and key job." As explained in Holloway's letter to the defendant company on October 15, 1936, such a job was one in which "the contractor will furnish building and all equipment complete and turn it over to the purchaser with nothing left to do but un-lock the door and go in and start the mill." At the beginning, it was thought the factory could be constructed for something like $500,000, but, as the requirements were cleared up and the factory was expanded to one with a capacity for grinding 1,500 tons of cane every 24 hours, easily convertible to one grinding 2,000 tons over the same period, the price steadily increased until, on January 29, 1937, two days after Murphy wrote Holloway the letter of January 27 specifically enumerating those items to which his commission did not extend, he (Murphy) sent Holloway a list of the equipment recommended to go into a factory of such capacity, stating, in a separate letter, that the price would be $867,-100, including "cost of erection, erection materials, foundations, brickwork, a concrete stack and is what you term a 'lock and key' job," the only requirements for its expansion to the 2,000 ton capacity being "a 3-roll mill without engine, a thin juice pump, extend the bagasse carrier, one juice heater, extend the Settler, extend the Oliver Filter, add one evaporator body with level regulator, extend the pan supply tanks, add one pan and condenser, add crystalizers, three centrifugals with motor, one boiler unit with furnace, one Turbo-generator and extend the switchboard."

The contract for the construction and erection of a 2,000 ton capacity factory, ready for operation in seven months thereafter, was finally signed in New York by the Buffalo Forge Company—substituted for the Squier company principally because of its higher financial rating—on March 20, and by the Iberia Sugar Cooperative, Inc.,

on March 23, 1937, for the recited consideration of $930,945.

When, a short time later, the plaintiff endeavored to collect the commission due him, he was advised, in a letter of May 28, 1937, that while the company's standard practice was to pay commissions only when final payment on the job had been made, if he required "a few thousand dollars, we can arrange to give such amounts, to you on account." No such advance having made him by the end of July, Holloway, in a letter of July 30, asked Schwarz to review all of the correspondence between them and Holloway's wire of July 29 with respect thereto, stating: "I realize that you have been busy but you must also realize that I have been very patient. I think I was very reasonable in my request in asking for a $10,000.00 payment on commissions amounting to considerably more than $40,000."

Schwarz's reply to this letter on August 6, is as follows:

"We are enclosing our associate's, the Buffalo Forge Co., check for $5,000.00 on account. It is just impossible to sum up accurately the amount we are to pay you because we haven't any of the cost figures of erection, foundation materials, nor have we purchased a good many of the items such as piping on which no commission is included.

"We know, however, that the total will not be anything like $40,000.00; therefore, until the execution of the contract is a little farther along it is impossible to say definitely what the amount will be. We have asked our auditors whether they could draw up a summary of the advance items for us and they tell us that this is absolutely impossible at this time as a good part of the work is not yet accomplished and no statement, therefore, can be compiled.

"I have been able to convince the management that I am satisfied that the amount due you should be in the neighborhood of $5,000.00 and we have agreed to forward you a check accordingly, on my say-so, without demanding a statement.

"I am sorry that the matter must be handled in this way but we had no idea you would ask for an advance payment on commission, and we expected that when the contract had been executed we could draw up a statement and compile the commission due you at that time."

In the meanwhile, on July 31, by a letter crossing plaintiff's letter of July 30, Schwarz wrote the plaintiff as follows:

"The writer knows he owes you an apology for not giving the matter of commissions earlier attention but we hope you will appreciate the enormous amount of detail work and the traveling about the country endeavoring to obtain early deliveries in labor troubled sections so as to produce the sugar factory in time for this crop, that this job entails. The matter of commissions due you is something which must be calculated to determine what amounts are due you and then a credit memorandum put through so that there is an account established against which we can direct a payment."

On August 18, Holloway acknowledged receipt of the $5,000 check sent him on August 6 and advised Schwarz that if he was serious in his statement that the total commissions due him under the contract would "not be anything like $40,000," and in his statement that he had "been able to convince the management * * * that the amount due * * * should be in the neighborhood of $5,000," then their viewpoints were "diametrically opposite," adding:

"It seems to me that the sensible thing for both of us would be for you and me to agree upon the items that are to be included in erection costs and deducted from the total sales price to show the amount upon which the commission is being figured and then allow our auditor to check your records each week at New Iberia. In this way any difference of opinion as to whether any item should not be included could be adjusted or a record of it kept separately so that when the job is finished, we would either be in entire agreement or the items upon which we disagreed would be so small that an adjustment could be reached."

Despite this suggested means of clearing up any misunderstanding as to what items Holloway's commission extended to, the defendant, on August 24, wrote him as follows:

"*We wish there was some way of establishing the commission due you, as, frankly, we are guided by impressions more than figures in our statements to date.* It may be possible to arrive at some approximate figure as soon as we have finished our purchasing and shipping of material, which is at its height at the present time. We know you can well realize that it takes almost as long to buy a special valve as it does to buy a vacuum pan so far as the actual study of specifications and locating the proper design, and we are in the midst of this with an enormous staff of engineers laying out piping and our staff in the office is working without interruption in getting this out. This work is paramount and we cannot for a moment let up on it or it will mean the non-delivery of the material in time to complete the plant when promised. In a few weeks the greater part of this work should be done and we will again make a study of this to see whether we cannot give you something definite on this subject.

"Will you please tell us whom you represent at the present time and when this representation became effective so that we may keep our files up to date on our work in Louisiana." (Italics ours.)

On September 11, 1937, Schwarz for the Squier company, again wrote Holloway, this time as follows:

"On August 27th we received your wire asking for an additional $5,000.00 and subsequently your visit in which you explained your needs for a further advance on commissions, and accordingly on August 31st we wired you in care of the Knickerbocker Hotel, New York City and subsequently received your acknowledgment from the Hotel Biltmore and we are glad to see that the Knickerbocker forwarded our wire to you. This wire read, 'Mailing Check For $5000.00 To New Orleans As Advance Per Your Request.'

"As we explained to you we are not able to determine the total amount of commissions which will be due you when final payment is made but we have prevailed upon the Comptroller's division to forward this additional amount to you."

No further advances having been made, the defendant, after a great deal of importuning on the part of Holloway, wired him on January 14: "Audit Still Unfinished However Attempting To Arrange Payment On Account As Requested, Will Wire You Shortly," then, on January 21, again wired him advising that check for $7,500 was being sent on account, and, in forwarding this check on the same day, said:

"Attached is a check for $7500.00, payment on commission account which the writer has been able to arrange to send you at this time, *advising our company that payment of the balance owing you would be made as soon as we can complete the audit of the Iberia accounts.*" (Italics ours.)

In this same letter Schwarz advised Holloway his (Schwarz's) unexpected stay in Louisiana had made it impossible to draw up the "various items of the New Iberia statement," but that as soon as the work in the accounting division, occasioned year-ending auditing, had eased up, they would get to work on that particular statement.

Upon receipt of the wire with reference to the $7,500 check, Holloway, replying by wire the same day, sought to have the amount increased to $10,000, the amount formerly requested, by an additional check of $2,500, and, on the following day (January 22), referring to both of these wires and stressing his need of the entire $10,000 to meet expenses, he again wrote asking that he be given a statement of the New Iberia account.

Replying to this letter on the 26th, the defendant stated:

"Received your wire (of January 21) and letter of January 22nd, and I am sorry my best efforts with the company are not satisfactory. The amount due you, if anything, is an unknown quantity to us and I cannot make a definite statement to the company nor can I give them the amount until the accounts have been audited. The amounts paid to you so far were entirely based on my opinion—not upon any official acceptance of an obligation.

"I will be glad to continue to explain your opinion to the company but cannot give you any assurance of action at this time until we can find time to audit the accounts.

"As I told you in Iberia, a great many of the suppliers have not completely invoiced us as yet and insufficient time has made it impossible for the cost division to draw up the itemized statement of items.

"There is no thought on the part of the company to delay this as they are quite as anxious as you are to close this particular account and march on with new business which is coming into our shops right along. The delay is not unusual, but merely the usual course of events, the Iberia job being, we admit, unusually large and consequently requiring an unusual length of time to set

up all the accounts in their proper place." (Brackets ours.)

On January 29 following, Holloway advised the company that, having been unable to obtain the balance due him or a statement as to when he could expect payment, he was turning the matter over to his attorneys to take such action as they might deem necessary to have the entire matter immediately and definitely settled.

The conclusion is inescapable from the foregoing correspondence, when read in connection with the letter of January 27, 1937, that Holloway was to be paid a commission on all machinery in the complete "lock and key job" factory sold the Iberia Sugar Cooperative, Inc., by the defendant with the exception of that machinery purchased from the companies represented by the plaintiff in Louisiana and the specific items listed in the said letter.

In the first place, it is obvious to us that if the commission to be paid the plaintiff was only on the machinery manufactured by the Squier company, it would have been a very simple matter for the company to have so stated in its letter of January 27, 1937, instead of advising him that its quotations were "on complete sugar factories for the state of Louisiana." Further, if such was the company's intention, it would not have been necessary, in stipulating the commission to be paid the plaintiff, to have excluded the cost of the building, or those "items which go to make up the complete proposition" purchased from companies already represented by Holloway in Louisiana. In other words, there would have been no necessity for securing complete invoices

from "the suppliers," or audits of all of the accounts before computing the plaintiff's commission, as pointed out in defendant's letters of August 6, 1937, and January 26, 1938, typical of so many others to be found in this correspondence.

As previously pointed out, it is our opinion that the language used in the letter of January 27, 1937, is clear and explicit, and the conclusion we have reached after carefully studying all of the evidence bears out our first impression. We think this conclusion is further fortified by the defendant's own interpretation of this agreement, as reflected in its letter of April 16, 1937 (written scarcely a month after the confection of the contract for the construction of the New Iberia factory), where reference is made to Holloway's prospective sale of another sugar mill in Louisiana:

*"When we bid on this job last Saturday we included your usual 5 percent commission * * *.*

*"The next time we bid, we will have to pay you a commission on only material furnished by us,* that is, we will not include a commission on the motors, and electrical equipment, the gear reducers, the shreader, and the Link Belt equipment. * * *

"If this is not agreeable to you, we can see no other way than to back out of the bidding entirely." (Italics ours.)

Later, on April 22, the defendant addressed another letter to the plaintiff withdrawing all quotations given him up to that time and advising that because of the rather mixed up understanding regarding commissions "no commission of any amount is

·to be inferred to any quotation in the future unless accompanied by a statement from us specifically stating the amount of commission calculated." Continuing the defendant company declared: "We based our commission allowances with you in the beginning on your statement that heavy machinery manufacturers were paying you 10% commission. You no doubt had certain manufacturers in mind; however, on subsequent study of the market we found that at least the people with whom we had to compete in the sale of equipment, in the main paid 2½% and in some specific instances 5%, but that *in complete factories* there was a definite limit on the total amount of commission that had to be carried by any particular contract." (Italics ours.)

Then we find in the letter of January 21, transmitting to the plaintiff the check for $7,500, the last advance made on his commission, the concession on the part of the defendant that a balance was still due which would be paid as soon as the defendant could "complete the audit of the Iberia accounts."

This leaves for our determination the amount of commission now due the plaintiff.

Holloway's only proof in connection with his demand is in conformity with the allegations of his petition, that is, from the estimate submitted by the defendant prior to the execution of the contract with the Iberia Sugar Cooperative, Inc., of the probable and approximated cost of the factory, as well as the percentages thereof (estimated at 20% of the total cost) going into the items on which he was not to receive a commission, contending that it was incumbent upon the defendant to make a complete accounting thereof since the exact figures were within the peculiar knowledge of the company, and that, having failed to do so, it was bound by this estimate.

While the defendant did, on the last day of the trial, and in connection with the testimony of E. D. Murphy, a sales estimator and correspondent of the defendant company, offer and submit in evidence a rough estimate on which its bid for the construction of the New Iberia sugar factory had been predicated, terming the same a "selling estimate," and also submitted, unsupported by any vouchers, invoices, or report of a certified public accountant, a rough statement of the alleged cost to it of the construction of the factory, our appreciation of these statements is that they are just what they purport to be—rough estimates of the selling price and actual cost of the factory compiled by an employee who had no connection with the company's accounting division and had no personal knowledge of its bookkeeping.

Even if the plaintiff were bound by the figures to be found in these rough estimates we are unable to compute therefrom, with any legal certainty, the exact amount due him, and in the interest of justice, believe the case should be remanded to the lower court for the purpose of establishing the amount due him, reserving to both the plaintiff and the defendant the right to supplement the evidence in connection therewith.

For the reasons assigned, the judgment of the lower court is annulled and set aside and the case is hereby ordered remanded

to the lower court for the determination of the amount of commission now due the plaintiff, consistent with the views herein expressed; all costs of this appeal to be borne by the defendant, all other costs to await the final determination of the case.

ODOM, J., absent.